UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOGICAL MEDIA NETWORK INC., ,<br><br>Plaintiff,<br><br>v.<br><br>CENTERPOINT MEDIA LLC, PAUL ROBERTS and RENE RAPP,<br><br>Defendants. | CASE NO. 13-CV-4177<br><br>**DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE** |

## TABLE OF CONTENTS


I. **INTRODUCTION** .......... 1

II. **FACTUAL BACKGROUND** .......... 2

A. Roberts is an Internet marketing consultant who works for a variety of customers and never agrees to an exclusive arrangement. .......... 2

B. Roberts ceased working with Logical Media after ownership changed and Logical Media demanded an exclusive contract. .......... 3

C. Defendants operate an affiliate network using Roberts' knowledge and do not rely on any information from Logical Media. .......... 4

D. Rene Rapp is a former technical employee of Logical Media who returned all proprietary information after resigning. .......... 5

E. Logical Media is a long-standing company that will not be irreparably harmed if an injunction is not granted. .......... 7

F. Defendants operate a start-up company that would be irreparably harmed by an anti-competitive injunction. .......... 7

III. **ARGUMENT** .......... 7

A. Logical Media cannot prove irreparable harm. .......... 7

B. Logical Media cannot prove that it is likely to succeed on the merits nor can it demonstrate sufficiently serious questions going to the merits to make them fair grounds for litigation. .......... 9

1. Logical Media had a non-exclusive contract with Roberts and has no basis to object to his use of his own information. .......... 9
2. Logical Media may not pursue claims against Rapp in this Court. .......... 11
3. Rapp returned all proprietary information. .......... 11
4. The noncompete provisions of Rapp's employment contract are unenforceable. .......... 12

C. Defendants will suffer irreparable harm if an injunction is granted. .......... 12

IV. **CONCLUSION** .......... 13

## I. INTRODUCTION

The current owners of Plaintiff Logical Media Network, Inc. purchased the company and discovered that one of Logical Media's contractors, Paul Roberts, had a non-exclusive consulting agreement wherein he was free to use his knowledge of the top Internet affiliates for the benefit of any company who hired him to construct marketing campaigns. Logical Media asked Roberts for an exclusive arrangement, and Roberts refused.

Logical Media hopes to misuse the litigation process to ask the Court to order what it could not obtain from Roberts: the exclusive use of Roberts' knowledge. But there is simply no legal basis for Logical Media's claims. Roberts and his new company, CenterPoint, are free to use Roberts' contacts and knowledge.

Logical Media's claims against its former employee Rene Rapp are even more tenuous. Logical Media claims that Rapp must have taken information after they cut her hours and she left Logical Media to search for new employment because she now works for CenterPoint, and CenterPoint has contacted former Logical Media contacts. But this is mere speculation, and wrong. CenterPoint relies on Roberts' independent knowledge to identify customers, not information stolen from Logical Media. Lastly, Logical Media claims that an employment agreement it drafted and required Rapp to sign prevents her from ever working for a competitor. But Logical Media chose to rely on California law, and California expressly bars such noncompetition provisions. Further, Logical Media knew that Rapp was going to work in the same industry when she left, and even offered to help her find new employment.

There is simply no basis for the relief Logical Media requests: that Defendants be prevented from working with any of Logical Media's customers. And even if Logical Media had identified a factual basis for its motion, temporary relief should not be granted because Logical Media will not suffer irreparable harm without it, and the harm to CenterPoint of granting the order is far greater than the harm to Logical Media of waiting until a resolution on the merits.

## II. FACTUAL BACKGROUND

### A. Roberts is an Internet marketing consultant who works for a variety of customers and never agrees to an exclusive arrangement.

A successful Internet business requires that Internet users visit its website. In order to attract Internet traffic, Internet advertisers pay other websites to place advertisements that users can click and be redirected to the advertisers' website. (June 24, 2013 Affidavit of Paul Roberts (Roberts Aff.) at ¶ 2.) Because there are hundreds of thousands of advertisers and potentially millions of websites on which to place ads, affiliate networks provide a convenient intermediary between advertisers and the websites, or "affiliates", that feature their advertisements. (Roberts Aff. ¶ 3.)

For example, the owner of a blog about sweepstakes might want to post advertising links to sweepstakes websites. (Roberts Aff. ¶ 4.) An affiliate network would allow the blog operator to select from a range of advertisements to post on the blog. (Roberts Aff. ¶ 5.) Once the blog operator, now an affiliate of the advertiser, posted the links, each time an Internet user clicked on an advertising link, the user would be transited to the advertiser's website via the affiliate network. (Roberts Aff. ¶ 6.) Each time the user completed an agreed action—like signing up for a service, completing a survey, or sometimes just clicking on the advertisement—the affiliate network would be paid by the advertiser. (Roberts Aff. ¶ 7.) The affiliate network would then compensate the affiliate. (Roberts Aff. ¶ 8.)

The affiliate industry is highly competitive. (Roberts Aff. ¶ 9.) Affiliates, advertisers, and affiliate networks rarely use exclusive contracts. (*Id.*) Instead, each is successful depending on the quality of service it provides to its respective customers, the Internet traffic that it drives, and the revenue it creates. (*Id.*)

Defendant Paul Roberts is a former consultant in the Internet advertising industry. (Roberts Aff. ¶ 10.) He's relied on his in-depth knowledge of Internet advertising to market his services to a variety of Internet-advertising businesses, including a variety of major affiliate networks, since 1998. (*Id.*) As a consultant, Roberts regularly advised affiliate networks on advertising campaigns. (*Id.*) One component of his advice was identifying key potential

advertisers and affiliates for the affiliate network to pursue. (*Id.*) For example, if Roberts were working on a sweepstakes promotion campaign, he would regularly review sweepstakes-related blogs and identify major bloggers. (*Id.*) He would then use commercially-available search tools to locate the contact information of those bloggers, and then contact the bloggers to offer an affiliate network's services. (*Id.*)

The identity of key bloggers and other potential affiliates—and the identity of potential advertisers—is not a secret. (Roberts Aff. ¶ 11.) Generally, the top bloggers and other potential affiliates are well-known within the particular industry segment in which they operate. (*Id.*) For example, the top real estate bloggers are known in the real estate marketing industry, and the top sweepstakes bloggers are known in the sweepstakes industry. (*Id.*)

### B. Roberts ceased working with Logical Media after ownership changed and Logical Media demanded an exclusive contract.

Roberts worked for Logical Media on a non-exclusive consulting basis, accepting a flat monthly fee to develop Logical Media's advertising campaigns. (Roberts Aff. ¶ 12.) Generally, he would be tasked with developing a campaign for a particular industry, and would use his industry knowledge and research expertise to identify and contact key players who might be interested in either an advertising campaign or in placing specific advertisements as an affiliate. (*Id.*) The arrangement was verbal, and Roberts made it clear that he was only able to work within the affiliate industry by providing advice to a number of different players. (*Id.*)

But then in 2012, Logical Media was purchased by new owners. (Roberts Aff. ¶ 13.) The new owners were inexperienced in affiliate marketing, and asked Roberts to agree to an exclusive contract, wherein Logical Media controlled the information Roberts provided and Roberts could not work for or provide information to any other affiliate network, or anyone else in the Internet marketing industry. (Roberts Aff. ¶ 14.) Roberts declined, telling Logical Media:

> This entire business is based upon relationships and I will not limit my ability to work with anyone. I was at Leadscon for 5-6 hours yesterday and I ran into so many old friends and co workers, some at companies like Integrate, Permission Data, ValueClick, Media Whiz, etc., that my agreement would prohibit me from

working with. I just do not see how I can justify limiting myself to work with these people, some which I have known for 10+ years.

(Schremp Aff. at Exh. E.)

Logical Media claims that Roberts misappropriated and is unfairly using its "Client List." (Schremp Aff. at ¶¶ 22-29.) If Logical Media has a "Client List" it was never shown to Roberts. (Roberts Aff. ¶ 15.) Instead, Roberts identified potential affiliates using his expertise, and would be given "daily reports" asking him to follow up with particular targets. Usually, the daily reports would include only affiliates Roberts had identified for Logical Media. (*Id.*) Roberts did not keep daily reports and does not rely on any information gained from Logical Media at CenterPoint. (*Id.*) Doing so would not make business sense: the Internet industry changes rapidly, and new research and constant contact with Roberts' connections is necessary to determine who is currently a viable potential affiliate or who is interested in running an advertising campaign. (*Id.*)

**C. Defendants operate an affiliate network using Roberts' knowledge and do not rely on any information from Logical Media.**

Roberts started CenterPoint in 2012. (Roberts Aff. ¶ 16.) CenterPoint is an affiliate network that markets to a broad range of Internet advertisers and affiliates, as opposed to Logical Media's "family friendly" focus. (*Id.*) But, because the major players in each industry segment are readily-identifiable, CenterPoint has contacted some potential advertisers and affiliates that are or were Logical Media customers. (*Id.*) Roberts does all the identification of potential advertisers and affiliates, and does not rely on any information he gained while consulting for Logical Media. (*Id.*) Instead, Roberts relies on his own knowledge of the industry, and then conducts new research to determine whether a potential affiliate drives enough Internet traffic to warrant contacting, or if an advertiser wants to use CenterPoint's services. (*Id.*) For example, Logical Media claims that Roberts relied on Logical Media's client list to identify ePrize as a potential advertiser. (*Id.*) But ePrize has a massive Internet presence, and it takes no special knowledge to determine that ePrize would be a valuable customer. (*Id.*) As Logical Media

admits, ePrize runs advertising campaigns for corporations as large as Welch's and Kirkland Foods. (Schremp Aff. at ¶ 28.)

CenterPoint obtains advertiser customers and affiliates by "prospecting" online by reviewing blogs and websites. (Roberts Aff. ¶ 17.) Once a potential customer is identified, contact information for that customer can be obtained through publicly-accessible information sources like LinkedIn, or sites like SellerCrowd, which allows a user to ask other companies in the online advertising world where they get their contacts. (*Id.*)

For example, CenterPoint regularly monitors the "CentsLess Deals" blog. By clicking on a banner advertisement on that blog, CenterPoint can view the URL and determine which advertising network or agency created the ad. CenterPoint can then contact that network or agency and ask which affiliate network they're using, and how much that affiliate network pays. (Roberts Aff. ¶ 18.)

CenterPoint sets pricing by asking affiliates what they are currently being paid by other affiliate networks. (Roberts Aff. ¶ 19.) If it is financially feasible, CenterPoint will either match or beat that price. (*Id.*) CenterPoint also competes with other affiliate networks by offering a range of services. (*Id.*) For example, CenterPoint offers email marketing, display advertising, and search marketing. (*Id.*) Logical Media does not provide those services. (*Id.*)

### D. Rene Rapp is a former technical employee of Logical Media who returned all proprietary information after resigning.

Defendant Rene Rapp is a former contractor of Logical Media who worked on the technical aspects of Logical Media's operation. (June 25, 2013 Affidavit of Rene Rapp (Rapp Aff.) at ¶ 2.) She set up accounts and resolved customer service and other technical issues. (*Id.*) In 2007, Rapp executed a consulting agreement with Logical Media. (Schremp Aff. at Exh. F)(the "Rapp Agreement").

The Rapp Agreement purportedly prevents Rapp from *ever* competing with Logical Media or working for a competitor:

> Contractor shall not, during or subsequent to the term of this Agreement, either directly or indirectly, alone or in conjunction with any other party, solicit, divert or appropriate or attempt to solicit, divert or appropriate any actual or potential customer, client, advertiser, affiliate or licensee of Company (collectively, "Customer") for the purpose of providing the Customer with services or products competitive or similar with those offered by Company

(Schremp Aff. at Exh. F, ¶ 4.) It claims Logical Media is entitled to $50,000 in liquidated damages for any beach of the confidentiality or non-solicitation provisions. (Schremp Aff. at Exh. F, ¶ 6.) The Rapp Agreement is governed by California law. (Schremp Aff. at Exh. F, ¶ 5 (J).) It provides that all disputes "of any nature whatsoever, arising between parties out of the Agreement or the resulting transactions, shall be decided by neutral, binding arbitration before a single arbitrator under the auspices of the Judicial Arbitration and Mediation Service ("JAMS") in Los Angeles, CA." *Id.* Although it allows a party to seek interim or conservatory relief such as a temporary restraining order or preliminary injunction, the exclusive venue for such relief is Los Angeles. *Id.*

Rapp left employment with Logical Media on November 15, 2012. (Rapp Aff at ¶ 3). She left after Logical Media cut her work hours and pay. (*Id.*) Logical Media knew that she would be working in the affiliate marketing industry after she left, and offered to help her find new employment, including agreeing to let her attend an industry trade show while still employed at Logical Media for the purpose of looking for prospective employers, and offering to provide any recommendation she needed. (*Id.*)

Rapp returned all of Logical Media's property, and kept none of Logical Media's confidential or proprietary information. (Rapp Aff, at ¶ 4.) She did not take a "Client List" or any list of contacts or information. If Logical Media has any trade secrets, they are not known to Rapp. (*Id.*) The relationships she maintains in the industry were established prior to her affiliation with Logical Media. (*Id.*)

She began working for CenterPoint on December 17, 2012. (Rapp Aff. At ¶ 5.)

**E. Logical Media is a long-standing company that will not be irreparably harmed if an injunction is not granted.**

Logical Media has been in business since 2005. (Roberts Aff. at ¶ 20.) It brags on its website that it is the "online leader in family-friendly brand name marketing" and boasts of its "Top 10 Ranking in Website Magazine." (*Id.*) It claims over 1500 active affiliates, of which it alleges Defendants are competing for the business of only a few. (Schremp Aff. at ¶¶ 2-29.)

**F. Defendants operate a start-up company that would be irreparably harmed by an anti-competitive injunction.**

Affiliate networks grow by providing consistent customer service. (Roberts Aff. at ¶ 21.) Before they are established within the Internet marketing industry, an affiliate network can be crippled by virtually any adverse event. (*Id.*) If the temporary restraining order or injunction is granted, CenterPoint will have to break off relationships with some of its affiliates and advertisers. (*Id.*) Because Logical Media has a broad market presence, many of the major advertisers and affiliates would be off-limits. (*Id.*) At this juncture in its development, it is unlikely that CenterPoint would survive this breach of its customer service. (*Id.*)

## III. ARGUMENT

**A. Logical Media cannot prove irreparable harm.**

Temporary restraining orders and preliminary injunctions are among "the most drastic tools in the arsenal of judicial remedies," and courts only use them with great care. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). As the Supreme Court recently noted, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 377, 172 L. Ed. 2d 249 (2008).The standard for either a temporary restraining order or a preliminary injunction is the same. *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) . To obtain a preliminary injunction or a temporary restraining order, the moving party must demonstrate:

> (1)irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to

> make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor.

*MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quotation marks omitted). The moving party bears the burden of proving each element by a preponderance of the evidence. *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 2152, 2008 U.S. Dist. LEXIS 22026, 2008 WL 759353, at *4 (S.D.N.Y. Mar. 20, 2008).

Logical Media claims that it will be harmed because it might lose business to CenterPoint. But because Logical Media's injuries could be compensated with monetary damages, Logical Media has not proven irreparable harm.

Irreparable harm is the "single most important prerequisite" for a preliminary injunction to issue. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). To satisfy the irreparable harm requirement, Logical Media must demonstrate that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). Where there is an adequate remedy at law, such as an award of money damages, "injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).

A substantively identical claim to Logical Media's was recently rejected by the Second Circuit. In *Faiveley*, 559 F.3d 110, the defendant allegedly used a trade secret to benefit its own business at the expense of the plaintiff's. Noting that money damages could compensate for any lost business, the Court reversed the trial court's determination that misuse of a trade secret automatically resulted in irreparable harm. *See also Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996)("the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages.").

Like *Faively* and *Geritrex*, Logical Media does not claim that Defendants are publicly disseminating trade secrets. Instead, Logical Media only complains that it is losing business to Defendants because Defendants are using Logical Media's client list and pricing information. In the unlikely event Plaintiff prevails at trial, it can recover all of its damages, and preliminary relief is neither needed nor warranted.

**B. Logical Media cannot prove that it is likely to succeed on the merits nor can it demonstrate sufficiently serious questions going to the merits to make them fair grounds for litigation.**

**1. Logical Media had a non-exclusive contract with Roberts and has no basis to object to his use of his own information.**

Citing only to inapposite general principles of law, Logical Media admits that it did not have a written or exclusive agreement with Roberts, but claims that Roberts is still prevented from working with any of Logical Media's current or former clients in his new company. Logical Media's claims are either frivolous or unsupported by anything other than speculation.

First, Logical Media claims that Roberts violated his fiduciary duty by developing business relationships with affiliates while he was working for Logical Media. But Logical Media objects only a *one week* overlap between Roberts' work for Logical Media and his establishment of CenterPoint. (Memorandum at 6.) Logical Media identifies no particular action Roberts took that violated his duties to Logical Media: filing business organization paperwork is hardly a breach of any duty to another company. Further, Roberts had a non-exclusive contract with CenterPoint, and thus was free to develop business relationships with anyone. (Roberts Aff. at ¶ 12.)

Logical Media claims that Roberts repeatedly agreed to keep private Logical Media's confidential information. But even assuming that this is true, Logical Media identifies no confidential information used by Roberts. Instead, Logical Media complains that CenterPoint has contacted major Internet players, both advertisers and affiliates. But without an exclusivity or noncompete agreement, Logical Media cannot prevent Roberts from using his common sense and industry experience to identify good potential customers. Roberts has done exactly that, and

has not relied on any confidential information to identify CenterPoint's advertisers or affiliates. (Roberts Aff. at ¶¶ 15-19.)

CenterPoint obtains advertiser customers and affiliates by "prospecting" online by reviewing blogs and websites. (Roberts Aff. at ¶ 17.) Once a potential customer is identified, contact information for that customer can be obtained through publicly-accessible information sources like LinkedIn, or sites like SellerCrowd, which allows a user to ask other companies in the online advertising world where they get their contacts. (*Id.*)

For example, CenterPoint regularly monitors the "CentsLess Deals" blog. (Roberts Aff. at ¶ 18.) By clicking on a banner advertisement on that blog, CenterPoint can view the URL and determine which advertising network or agency created the ad. (*Id.*) CenterPoint can then contact that network or agency and ask which affiliate network they're using, and how much that affiliate network pays. (*Id.*)

Using outdated information like a contact list from months or years ago obtained from Logical Media would not make sense. The Internet industry changes rapidly, and new research and constant contact with Roberts' connections is necessary to determine who is currently a viable potential affiliate or who is interested in running an advertising campaign. (Roberts Aff. At ¶ 15.)

Second, Logical Media claims Roberts must have misappropriated Logical Media's pricing data because CenterPoint's payouts to affiliates are higher than Logical Media's. (Memorandum at ¶ 6.) But Roberts did not, but instead is simply operating a more efficient operation than Logical Media's current owners are. CenterPoint sets pricing by asking affiliates what they are currently being paid by other affiliate networks. (Roberts Aff. at ¶ 19.) If it is financially feasible, CenterPoint will either match or beat that price. (*Id.*) CenterPoint also competes with other affiliate networks by offering a range of services. (*Id.*) For example, CenterPoint offers email marketing, display advertising, and search marketing. Logical Media does not provide those services. (*Id.*)

Logical Media also sets prices in this manner. Affiliates are free to share what other affiliate networks are paying them in an effort to negotiate better rates, and often do. For example, the only reason Logical Media knows what CenterPoint is charging is because affiliates told them in an attempt to get Logical Media to beat CenterPoint's offer. (Schremp Aff. at Exh. H.)

Each affiliate network receives a set amount from advertisers for each advertising campaign. For example, in the example used by Logical Media, both Logical Media and every other affiliate network (including CenterPoint) received $10 per successful transaction. (Schremp Decl. at Exh. H.)) CenterPoint sets its payout as high as it can and still turn a profit; in Logical Media's example case, at $8 paid to the affiliate and $2 kept by CenterPoint. Logical Media, presumably operating with higher overhead or simply more greed, refused to increase its payout beyond $7.50. Logical Media has not identified the breach of a duty or a misappropriation of a trade secret: it simply objects to the operation of a free market.

**2. Logical Media may not pursue claims against Rapp in this Court.**

The Rapp Agreement sets the exclusive venue for preliminary relief in Los Angeles. (Schremp Aff. at Exh. F, ¶ 4.) This Court enforces reasonable choice of venue provisions under either New York or California law. *Insurance Co. of N. Am. v. ABB Power Generation*, 925 F. Supp. 1053, 1060 (S.D.N.Y. 1996.) Logical Media identifies nothing unreasonable about the Rapp Agreement's venue provision—which it drafted. It must file suit in Los Angeles if it wishes to pursue claims against Rapp.

**3. Rapp returned all proprietary information.**

At the conclusion of her employment, Rapp returned all information belonging to Logical Media. (Rapp Aff. at ¶ 4.) She did not take a "Client List" or any list of contacts or information. If Logical Media has any trade secrets, they are not known to Rapp. (*Id.*) The relationships she maintains in the industry were established prior to her affiliation with Logical Media. (*Id.*) Logical Media offers only speculation to the contrary: Logical Media identifies no missing information, computer logs showing unapproved access or copying, or anything other than its

unsupported guess that Rapp must have taken its "Client List" because CenterPoint contacted some affiliates and advertisers that are also Logical Media clients. But as Defendants admit, Roberts had independent knowledge of key players in the affiliate industry, and could have identified CenterPoint's clientele based on that knowledge. Proving that Roberts did so is in fact the centerpiece of Logical Media's claims against Roberts. Rapp did not take Logical Media's data, and there is simply no basis to find that Logical Media has met its burden of proving that Rapp did.

**4. The noncompete provisions of Rapp's employment contract are unenforceable.**

Logical Media asks this Court to enforce the provisions of an employment contract that forbids Rapp from *ever* competing with Logical Media or working for a competitor. But California law applies to the Rapp Agreement, and California prohibits noncompete provisions. (Schremp Aff. at ¶ 5 (J).) Cal Bus & Prof Code § 16600 provides that "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Other than statutory exceptions not applicable here, this sections voids any noncompete agreement. *NewLife Sciences, LLC v. Weinstock*, 197 Cal. App. 4th 676, 681 (Cal. App. 2d Dist. 2011).

**C. Defendants will suffer irreparable harm if an injunction is granted.**

Even if Logical Media could demonstrate substantial questions on the merits of the dispute, Logical Media is not entitled to preliminary relief. Logical Media must also prove that the balance of hardships "tips *decidedly*" in Logical Media's favor. *MyWebGrocer, L.L.C.*, 375 F.3d at 192 (emphasis added.) The balance of hardship does anything but tip in Logical Media's favor.

Defendants operate a start-up affiliate network. Although they have substantial expertise in affiliate networking and are well on their way to building a successful business, CenterPoint has not yet built a reputation in the affiliate community. (Roberts Aff. at ¶ 24.) Logical Media is a long-standing company with a broad base of customers. Logical Media requests an injunction

that would not only prevent Defendants from soliciting any of Logical Media's clients, but would require Defendants to breach a portion of Defendants' existing relationships. It would cripple Defendants' business. And at this early stage of Defendants' business development—without an established track record in the industry—it is unlikely that Defendants would recover.

## IV. CONCLUSION

Logical Media attempts to misuse the litigation process to gain a business advantage over a new competitor. But Logical Media simply has not identified a factual basis for its claims. It offers nothing more than speculation that Defendants stole its "Client List", even though the clients it objects to are readily apparent as viable customers from simple Internet searches and knowledge of the affiliate marketing industry. And it tries to keep its former employee perpetually out of the affiliate marketing industry, and accuses her of stealing confidential information without any evidence whatsoever. Logical Media's bad-faith attempt to squash competition should be rejected, and its motion denied.

Dated: June 25, 2013

Respectfully submitted,

**KLEIN MOYNIHAN TURCO LLP**

*By:* *s/ John Greene*

John Greene (JG 4911)
450 Seventh Avenue, 40th Floor
New York, NY 10123
(212) 246-0900
jgreene@kleinmoynihan.com
Tel: (212) 246-0900
Fax: (212) 216-9559

Attorney for Defendants

**NEWMAN DU WORS LLP**

*By:* *s/ John Du Wors*
John Du Wors (Admission Pending)
Newman Du Wors LLP
1201 Third Avenue, Suite 1600
Seattle, WA 98101
duwors@newmanlaw.com
Tel: (206) 274-2800
Fax: (206) 274-2801

Attorney for Defendants