UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOGICAL MEDIA NETWORK INC., | |
| Plaintiff, | **REPLY AFFIDAVIT IN FURTHER SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE** |
| v. | |
| CENTERPOINT MEDIA, PAUL ROBERTS and RENE RAPP, | Civil Action No.: 13 CIV 4177 (SAS) |
| Defendants. | |

STATE OF            )
                    )ss:
COUNTY OF           )

**RACHEL SCHREMP**, being duly sworn, deposes and says:

1. I am the Vice President of the plaintiff, Logical Media Network, Inc. ("Plaintiff"), in this Action and I submit this reply affidavit in further support of Plaintiff's' Order to Show Cause seeking, among other relief, a court order directing the Defendants: (a) to stop soliciting Plaintiff's existing clients as identified in the confidential lists of its publishers ("Affiliates") and advertisers ("Advertisers") (Affiliates and Advertisers shall collectively hereinafter be referred to as the "Client Lists") shared with defendant Paul Roberts ("Defendant Roberts") and defendant Rene Rapp ("Defendant Rapp") during their employment with Plaintiff; (b) to return immediately to Plaintiff, and not to disclose to any person or entity, all business information of Plaintiff obtained or used by Defendant Roberts and/or Defendant Rapp during their employment with Plaintiff, including the Client Lists; (c) to disclose to Plaintiff the identity of all persons not employed by Plaintiff to whom Defendants at any time disclosed Plaintiff's confidential and proprietary trade secret information including specifically the Client Lists; (d) to stop the Defendants from disclosing any information related to this Action or this request for relief during

the pendency of this Action; and (e) such other and further relief as this Court deems just and proper.

2. I am personally and fully familiar with all of the facts and circumstances set forth herein based upon my personal knowledge as well as a review of the Plaintiff's books and records.

**PLAINTIFF'S RESPONSE TO DEFENDANT ROBERT'S ALLEGATIONS**

3. Defendant Roberts claims in his Affidavit in Support of Defendants' Response to Order to Show Cause, dated June 25, 2013, ("Roberts Aff") that he obtains advertisers and affiliates by "prospecting" blogs and websites. See Roberts Aff ¶ 17. While it is possible for someone to obtain information pertaining to advertisers and affiliates in this matter, it would not have been feasible for Defendant Roberts to have obtained the amount and specificity of information contained in Plaintiff's Client Lists in the time frame in which he did.

4. It is quite telling that Defendant Roberts does not, in any form or manner, explain to this Honorable Court how Centerpoint was able to, in such a brief period of time since its existence in July 2012, become a top competitor of the Plaintiff when the Plaintiff has been in business for more than six years and spent that entire period of time compiling its comprehensive Client Lists.

5. The process of "prospecting" as claimed by Defendant Roberts is tedious and time consuming. It is respectfully submitted that it would be an impossibility for a competitor of the Plaintiff to know the Plaintiff's top Advertisers, top Affiliates and price points without having access to the Plaintiff's confidential Client Lists. Defendant Roberts could not have developed such an extensive client list, consisting of a majority of Plaintiff's Advertisers and Affiliates, with such specificity and in this short amount of time by simply prospecting online blogs and websites for clients as alleged by Defendant Roberts.

6. Plaintiff's Client Lists do not simply contain names and website addresses for its Advertisers and Affiliates, instead, they provide detailed information such as the phone numbers, email addresses, key decision-makers, revenue history and social security numbers/tax identification numbers. For Defendant Roberts to claim that such information is readily available and easily attainable through monitoring blogs and prospecting is absurd.

7. In further contradiction of Defendant Robert's claims, Defendant Roberts was, in fact, have access to Plaintiff's Client Lists over the course of his employment with Plaintiff and he had access to the most valuable portion of the Advertiser List in his position as Director of Business Development while working for the Plaintiff. <u>See</u> Roberts Aff at ¶ 15.

8. Defendant Roberts also incorrectly alleges that he was paid a flat fee while working for Plaintiff. <u>See</u> Roberts Aff ¶ 12. However, Defendant Roberts actual compensation was a flat fee of Four Thousand Dollars ($4,000.00) per month <u>plus</u> ten percent (10%) of gross revenues from the specific business he generated on behalf of Plaintiff.

9. Defendant Roberts' also claims that he worked for Plaintiff on a "non-exclusive consulting basis". <u>See</u> Roberts Aff ¶ 12. However, this is simply not the case. Defendant Roberts, while employed by the Plaintiff, always acted and held himself out as working exclusively for the Plaintiff.

10. In fact, Defendant Roberts held himself out to the internet marketing industry as Plaintiff's Director of Business Development, as is clear from the signature line on Defendant Roberts email which lists this title and also lists his AOL instant messenger screen name as "LogicalMediaPaul". <u>See</u> Exhibit C attached to Plaintiff's Order to Show Cause.

11. Contrary to his claims, at no point during his employ with Plaintiff did Defendant Roberts ever indicate that he was working for other companies in the internet marketing industry or that he was working for any other affiliate network. Plaintiff was always led to believe that

Defendant Roberts worked solely for the benefit of the Plaintiff, which is why Defendant Roberts was receiving such compensation from the Plaintiff.

12. Not only are Defendant Roberts claims contradicted by his title and email signature, but they are also contradicted by simple logic. It would make no sense for Plaintiff to agree to allow its Director of Business Development to also work for the benefit of Plaintiff's competitors in the same industry.

13. The Plaintiff and Defendant Roberts spent a considerable amount of time negotiating an independent sales representative agreement, yet, during this time, Defendant Roberts never mentioned working for other affiliate markets or any other company in the industry. Instead, the only concern expressed by Defendant Roberts was related to his ability to work with others in the industry *subsequent* to his employment with Plaintiff. A copy of the July 5, 2012 email between Defendant Roberts and Plaintiff's C.E.O. is attached hereto as **Exhibit A**.

14. As may be seen in the email from Defendant Roberts to the Chief Executive Officer of Plaintiff on July 5, 2012, Defendant Roberts suggests that the parties "list the companies/clients/advertisers that I have brought on at Logical Media and agree that I cannot work with them for 12 months." Id.

15. Had Defendant Roberts made clear from the beginning that he was working with other advertisers and not solely for the benefit of the Plaintiff, Plaintiff would not have spent months negotiating an independent sales representative agreement with Defendant Roberts and simultaneously providing Defendant Roberts continued opportunity to develop relationships with Plaintiff's Advertisers.

16. On or about July 26, 2012, I received notice that Defendant Roberts had been offering advertising campaigns to competing networks. See Exhibit E attached to Plaintiff's Order to Show Cause.

17. As may be seen, when I asked Defendant Roberts why we had been receiving notice that he had been offering campaigns to other networks, Defendant Roberts responded "I have told other networks we are looking for traffic on our offers." Id.

18. If Defendant Roberts truly believed Plaintiff was aware that he was also working for Plaintiff's competitors, he would have stated this in a response. Instead, Defendant Roberts essentially denied the allegation and claimed that he was soliciting other networks on behalf of and for the benefit of Plaintiff.

19. Plaintiff is not trying to argue that these statements by Defendant Roberts constitute an enforceable agreement, but instead these statements clearly indicate that Plaintiff was not one of many companies Defendant Roberts was working for, but, rather, Defendant Roberts appeared to be working solely for the benefit of the Plaintiff.

20. From the limited documentary evidence discovered by the Plaintiff thus far, it appears that Defendant Roberts began building and developing Defendant Centerpoint and Defendant Centerpoint's client lists while still employed by the Plaintiff using the Plaintiff's confidential Advertisers.

21. Specifically, Defendant Roberts began coordinating a campaign with ePrize for the benefit of Defendant Centerpoint and, even, had the audacity to use his email account with the Plaintiff to effectuate such coordination. See Exhibit C attached to Plaintiff's Order to Show Cause.

22. Defendant Roberts claims that ePrize has a massive internet presence and that it takes no special knowledge to realize ePrize would be a valuable client. See Roberts Aff ¶ 16. However, what Defendant Roberts fails to point out is that he developed this relationship with Elizabeth Thiel of ePrize ("Ms. Thiel") while he was employed by Plaintiff and even coordinated

such campaign via his email account with the Plaintiff. See Exhibit C attached to Plaintiff's Order to Show Cause.

23. As may be seen, Ms. Thiel of ePrize contacted the Plaintiff, via Defendant Roberts as a representative of Plaintiff, to coordinate campaigns and media plans for Welch's, Kirkland, Michaels MiDesign, P&G and Microsoft Windows Phone. Id.

24. One week prior to leaving his employ with Plaintiff, and on the same day that Defendant Centerpoint was first formed, Defendant Roberts wrote to Ms. Thiel that he "would like to chat tomorrow if you have some time…". Id.

25. Despite ePrize initially contacting Plaintiff, upon information and belief, ePrize ultimately ran the aforementioned campaigns for Welch's, Kirkland, Michaels MiDesign, P&G and Microsoft Windows Phone through Defendant Centerpoint and not Plaintiff.

26. It is believed that Defendant Roberts behavior, as discussed above, via his use of the Plaintiff's confidential advertisers for the benefit of Defendant Centerpoint will be one of many examples ultimately discovered in this action.

27. Based on the foregoing, it seems quite evident that Defendant Roberts, while employed by Plaintiff, began working for his own benefit and for the benefit of Defendant Centerpoint by recruiting Plaintiff's confidential Affiliates and Advertisers to be clients of Defendant Centerpoint.

**PLAINTIFF'S RESPONSE TO DEFENDANT RAPP'S ALLEGATIONS**

28. Defendant Rapp's claim that the Plaintiff supported Defendant Rapp in looking for work with Plaintiff's competitors is absurd, particularly in light of the fact that this is in direct contradiction of the End of Affiliation Agreement which Defendant Rapp executed on November 16, 2012. See Affidavit of Rene Rapp dated June 25, 2013 ("Aff of Rapp") ¶ 3 and Exhibit G attached to Plaintiff's Order to Show Cause.

6

29. As may be seen from the End of Affiliation Agreement, Defendant Rapp acknowledged and agreed that she was bound by confidentiality and by her non-compete Independent Contractor Agreement. Id

30. In executing the End of Affiliation Agreement, Defendant Rapp claimed that she shredded all paper documents and deleted all information from her personal computer, yet there is no proof that any of this actually ever occurred. In fact, since Defendant Rapp was given the Client Lists as well as having access to the top producers via the Client Lists, coupled with Defendant Centerpoint's targeting of these very same top producers, it seems quite evident that Defendant Rapp did not comply and turn over and destroy all proprietary information of the Plaintiff.

31. Furthermore, Defendant Rapp claims that she "left" her employment with Plaintiff after her hours and pay were cut. However, in reality Plaintiff decided to release Defendant Rapp from the company due to the poor quality of her work, her numerous unexplained absences, and her unwillingness to comply with basic requests.

**WHEREFORE**, it is respectfully requested that this Honorable Court enter an Order granted the Plaintiff's motion in its entirety.

*/s/ Rachel Schremp*
**RACHEL SCHREMP**

Subscribed to and sworn before me
this ___ day of June, 2013

_____
NOTARY PUBLIC

7