UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOGICAL MEDIA NETWORK INC.,

                    Plaintiff,

          v.

CENTERPOINT MEDIA, PAUL ROBERTS and
RENE RAPP,

                  Defendants.

Civil Action No.: 13 CIV 4177 (SAS)

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
# ORDER TO SHOW CAUSE

Law Offices of Kishner & Miller
*Attorneys for Plaintiff*
420 Lexington Avenue, Suite 300
New York, New York 10170
Tel: (212) 585-3425
Fax: (212) 752-1810

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ........ii

COUNTER-STATEMENT OF FACTS ..…………..………………………………………............1

ARGUMENT.............................................................................................................................4

I.     PLAINTIFF WILL CONTINUE TO BE IRREPARABLY HARMED SHOULD THE INJUNCTION BE DENIED……………..……………..……………………………………..4

II.    PLAINTIFF HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS …………………………………………………………………….…......7

A. Defendant Roberts Never Had an Exclusive Contract with Plaintiff......................7

B. This Court Has the Authority to Entertain this Action Against Defendant Rapp In the Interests of Justice……………………………………………… ……………...9

C. The Purported Harm to the Defendants Is Far Less Than the Irreparable Harm Plaintiff Will Suffer Should the Injunction Be Denied…………………..………14

CONCLUSION ......................................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*
722 F.2d 988, 994 (2d Cir.1983)........................................................................5

*accord Delphine Software Intern. v. Electronic Arts, Inc*
1999 WL 627413, *3 (S.D.N.Y. Aug.18, 1999)(99 Civ. 4454(AGS) ..................4

*Advance Biofactures Corp. v. Greenberg*
103 A.D.2d 834, 478 N.Y.S.2d 344 (2d Dep't 1984)...........................................5

*Beatie and Osborn LLP v Patriot Scientific Corp.*
431 F Supp 3d 367, 378 (S.D.N.Y. 2006) ........................................................11

*Business Intelligence Services, Inc. v. Hudson*
580 F.Supp. 1068, 1072 (S.D.N.Y.1984) ...........................................................4

*Byrne v. Barrett*
268 N.Y. 199, 206–07, 197 N.E. 217, 218–19 (1935) .........................................5

*Cent. Contr. Co. v Maryland Cas. Co.*
367 F.2d 341, 344 (3d Cir. 1966) .....................................................................10

*Cie. Financiere de CIC et de L'Union Europeenne v Merrill Lynch, Pierce, Fenner & Smith Inc.*
232 F3d 153, 157 (2d Cir. 2000).......................................................................13

*Continental Group, Inc. v. Kinsley*
422 F.Supp. 838, 844–45 (D.Conn.1976) ...........................................................4

*In re Cuyahoga Equip. Corp.*
980 F. 2d 110, 117 (2d Cir. 1992) .................................................................11,12

*D & N Prop. Mgt. & Dev. Corp., Inc. v Copeland Companies,*
127 F. Supp. 2d 456, 461 (S.D.N.Y. 2001) .......................................................13

*Doubleclick, Inc. v. Henderson*
1997 WL 731413, *5 (N.Y.Sup.1997) .............................................................4, 5

*EarthWeb, Inc. v Schlack*
71 F Supp 2d 299, 309 (S.D.N.Y. 1999) ..........................................................4,6

*Faiveley Transp. Malmo AB v Wabtec Corp.*
559 F.3d 110, 118, 90 U.S.P.Q.2d 1312 (2d Cir. 2009) ......................................6

*Freeplay Music, Inc. v Verance Corp.*
    80 Fed Appx 137, 138 (2d Cir. 2003) ...............................................................7

*Hecht Foods, Inc. v. Sherman*
    43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dep't 1974)............................................5

*International Paper Company v. Suwyn*
    966 F.Supp. 246, 258–59 (S.D.N.Y.1997)..........................................................4

*Inflight Newspapers, Inc. v. Magazines In–Flight, LLC*
    990 F.Supp. 119, 137 (E.D.N.Y.1997)................................................................5

*Lumex, Inc. v. Highsmith*
    919 F.Supp. 624 (E.D.N.Y.1996)......................................................................4

*M/S Bremen v Zapata Off-Shore Co.*
    407 U.S. 1, 10, 92 S. Ct. 1907, 1913, 32 L Ed 2d 513 (1972) ...........................9

*Moore v Consol. Edison Co. of New York, Inc.*
    409 F.3d 506, 510 (2d Cir. 2005) ......................................................................7

*PepsiCo, Inc. v. Redmond*
    54 F.3d 1262 (7th Cir.1995) .............................................................................4

*R Squared Global, Inc. v Serendipity 3, Inc.*
    11 CIV. 7155 PKC, 2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011) ......................7

*Stewart Org., Inc. v Ricoh Corp.*
    487 U.S. 22, 23, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988) ..............................10

*Tom Doherty Assoc., Inc. v Saban Entertainment, Inc.*
    60 F.3d 27, 37, 64 USLW 2051 (2d Cir. 1995) ..................................................7

*Webcraft Technologies, Inc. v. McCaw,*
    674 F.Supp. 1039, 1047–48 (S.D.N.Y.1987) .....................................................5

**COUNTER-STATEMNT OF FACTS**

In the Defendants[1] Response to Order to Show Cause dated June 25, 2013 ("Defendants' Response") the Defendants make a number of claims and allegations which are inaccurate and, as a result are addressed by the Plaintiff via the affidavit of Rachel Schremp in further support of Plaintiff's Order to Show Cause.

Defendants claim that Defendant Centerpoint operates an affiliate network based solely on Defendant Roberts' knowledge. See Affidavit of Paul Roberts in Support of Defendants' Response to Order to Show Cause dated June 24, 2013 ("Roberts Aff") ¶ 16. Defendant Roberts claims that he obtains Defendant Centerpoint's advertisers and affiliates by "prospecting" blogs and monitoring websites. See Roberts Aff ¶ 17. While it is possible for someone in the internet marketing industry to obtain clients this way, it is not possible that Defendant Roberts, via this process, just so happened to coincidentally discover Plaintiff's top revenue-generating Affiliates and Advertisers and begin soliciting them for their business. See Affidavit of Rachel Schremp in Reply to Defendants' Response dated June 27, 2013 ("Schremp Aff") ¶ 3. The process of "prospecting" as claimed by Defendant Roberts is tedious and time consuming and there is no way that in Defendant Centerpoint's first few months of operations Defendant Roberts could have developed such extensive client lists, consisting of the top Advertisers and Affiliates on Plaintiff's Client Lists, in that amount of time by simply prospecting and monitoring online blogs and websites. Id. If nothing else, the amount of information and the detail of said information contained in Plaintiff's Client Lists, which Defendants are using to the benefit of Defendant Centerpoint, required substantial efforts from the Plaintiff to develop over an extended period of time, yet Defendant Roberts wants this Court to believe that he developed and discovered the

---

[1] Unless otherwise noted, the capitalized terms used herein shall have the same definition as in Plaintiff's Order to Show Cause and its supporting Affidavit, Affirmation and Memorandum.

same pertinent information in a matter of months. See Schremp Aff ¶ 4. Plaintiff's Client Lists do not simply contain names and phone numbers for its Advertisers and Affiliates, instead, they provides detailed information such as the clients' IP addresses, URLs, key decision-makers, and social security numbers/tax identification numbers. See Schremp Aff ¶ 6. For Defendant Roberts to claim that this information is readily available simply by monitoring blogs and "prospecting" is absurd. See Schremp Aff ¶ 6.

Defendant Roberts also claims he was never shown Plaintiff's Client Lists, which is absolutely false. See Roberts Aff ¶ 15. Defendant Roberts, by the very virtue of being the Director of Business Development, was given, had access to, and was compensated to assist in developing, Plaintiff's Advertiser List. See Schremp Aff ¶ 5. At no point during his employ with Plaintiff did Defendant Roberts ever have a non-exclusive agreement with Plaintiff. See Schremp Aff ¶ 5. Defendant Roberts was employed by Plaintiff as the Director of Business Development which is clearly indicated on Defendant Roberts email signature when he was with Plaintiff. See Exhibit C attached to Plaintiff's Order to Show Cause. Additionally, this is further supported by the fact that Plaintiff never would have allowed its Director of Business Development to also be working for its competitors. See Schremp Aff ¶ 12.

While working for Plaintiff it appears evident that the Defendant Roberts began building and developing Defendant Centerpoint and Defendant Centerpoint's client lists. See Schremp Aff ¶¶ 20-27. The foregoing is evidenced by Defendant Centerpoint's coordinating campaigns for advertisers and affiliates that originally contacted Plaintiff; however, instead of launching these campaigns with Plaintiff, these advertisers and affiliates launched their campaigns with Defendant Centerpoint. Id.

2

Shortly after Defendant Roberts opened and began operating Defendant Centerpoint, Defendant Rapp was hired by Defendant Centerpoint. See Affidavit of Renee Rapp in Support of Defendants' Response to Order to Show Cause dated June 24, 2013 ("Rapp Aff") ¶ 5. By hiring Defendant Rapp, Defendant Roberts has access to all of the Plaintiff's numbers, figures and price points. See Schremp Aff ¶ 30. Now, with the information obtained by Defendant Rapp and disclosed to Defendant Roberts and Defendant Centerpoint, the Defendants are able to target Plaintiff's Top Affiliates and Top Advertisers and undercut Plaintiff's pay-outs as they now know what the Affiliates and Advertisers are receiving from the Plaintiff. See Schremp Aff ¶ 30.

By having Plaintiff's Client Lists, the Defendants can decrease their overhead by targeting Plaintiff's Top Affiliates and Top Advertisers, while undercutting Plaintiff's pay-outs so that the Plaintiff's Affiliates and Advertisers would cease coordinating their campaigns through Plaintiff and, instead, coordinate same through Defendant Centerpoint. See Affidavit of Rachel Schremp in support of Plaintiff's Order to Show Cause ¶ 23. The Defendants ability to do the foregoing is a direct result of Defendant Roberts and Defendant Rapp's employment with the Plaintiff and, but for said employment with the Plaintiff, Defendant Centerpoint would not have been able to grow to the size it is today in such a relatively short period of time. See Schremp Aff ¶ 5. What it took Plaintiff ten years to build it only took Defendants a matter of months to replicate. Id.

Defendant Rapp claims that she left Plaintiff's employ because Plaintiff cut her hours and pay when, in fact, Plaintiff asked Defendant Rapp to leave based on her poor quality of work, numerous unexplained absences and complete lack of production in her position with Plaintiff. See Rapp Aff ¶ 3 and Schremp Aff ¶ 31. Defendant Rapp's allegations that Plaintiff helped her look for new employment with its competitors is absurd and in direct contradiction of the

Employment Agreement and the End of Affiliation Agreement, both executed by Defendant

Rapp. See Rapp Aff ¶ 3 and Schremp Aff ¶.

## ARGUMENT

### I. PLAINTIFF WILL CONTINUE TO BE IRREPARABLY HARMED SHOULD THE INJUNCTION BE DENIED

It is possible to establish irreparable harm based on the inevitable disclosure of trade

secrets, particularly where the movant competes directly with the prospective employer and the

transient employee possesses highly confidential or technical knowledge concerning

manufacturing processes, marketing strategies, or the like. Such a risk was present in *PepsiCo,*

*Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), wherein the Seventh Circuit analogized the former

employer's predicament to that of "a coach, one of whose players has left, playbook in hand, to

join the opposing team before the big game." *PepsiCo,* 54 F.3d at 1270. Similarly, in *Lumex, Inc.*

*v. Highsmith,* 919 F.Supp. 624 (E.D.N.Y.1996), the district court found a risk of inevitable

disclosure based on, *inter alia,* the employee's access to highly sensitive information concerning

manufacturing costs, pricing structure and new products, plus the fact that the industry in

question was a " 'copy cat' or cloning industry." *Lumex,* 919 F.Supp. at 629. See also

*International Paper Company v. Suwyn,* 966 F.Supp. 246, 258–59 (S.D.N.Y.1997); *Business*

*Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1072 (S.D.N.Y.1984); *Continental*

*Group, Inc. v. Kinsley,* 422 F.Supp. 838, 844–45 (D.Conn.1976); *Doubleclick, Inc. v. Henderson,*

1997 WL 731413, *5 (N.Y.Sup.1997); *accord Delphine Software Intern. v. Electronic Arts, Inc.,*

1999 WL 627413, *3 (S.D.N.Y. Aug.18, 1999)(99 Civ. 4454(AGS)) ("It is true that the case law

suggests that a person in possession of trade secrets, when working on a similar project, may

'inevitably disclose' the proprietary information and techniques of which he is in possession.").

*EarthWeb, Inc. v Schlack,* 71 F Supp 2d 299, 309 (S.D.N.Y. 1999).

*Doubleclick* is also instructive. The defendants in *Doubleclick* were two senior executives for an Internet advertising company who were caught misappropriating trade secrets as they surreptitiously plotted to form their own company to compete directly with their former employer. Both defendants had signed confidentiality agreements and one of them had also signed a non-compete agreement, although its applicability was disputed. Based on the evidence of actual misappropriation, which was "bolstered by ... a high probability of 'inevitable disclosure' of trade secrets", the court enjoined the defendants from launching their company, or accepting employment with any competing company, for a period of six months. *Doubleclick,* 1997 WL 731413, at *5–6.

While *Doubleclick* appears to represent a high water mark for the inevitable disclosure doctrine in New York, its holding rests heavily on evidence of the defendants' overt theft of trade secrets and breaches of fiduciary duty. See *Doubleclick,* 1997 WL 731413, at *7. Such misconduct has long been recognized as an appropriate ground for enjoining the disclosure of trade secrets, irrespective of any contract between the parties. See, e.g., *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 994 (2d Cir.1983); *Inflight Newspapers, Inc. v. Magazines In–Flight, LLC,* 990 F.Supp. 119, 137 (E.D.N.Y.1997) ("[A]n employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer.") (quoting *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207, 211 (S.D.N.Y.1987); *Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039, 1047–48 (S.D.N.Y.1987); *Byrne v. Barrett,* 268 N.Y. 199, 206–07, 197 N.E. 217, 218–19 (1935); *Advance Biofactures Corp. v. Greenberg,* 103 A.D.2d 834, 478 N.Y.S.2d 344 (2d Dep't 1984); *Hecht Foods, Inc. v. Sherman,* 43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dep't 1974)).

It is impossible to overstate the importance to Plaintiff of the relationships it has developed by and between the Advertisers and Affiliates. Every day that passes while Defendants continue to solicit and convert the Plaintiff's Clients, Plaintiff loses revenue. Moreover, there is irreparable harm in that Plaintiff will never be able to accurately assess and repair the damage caused by the Defendants to its relationships with its Advertisers and Affiliates unless and until this Honorable Court requires that the Defendants immediately cease in their attempts to convert the Plaintiff's confidential Client Lists. The Defendants' wrongful conduct is threatening the very existence of Plaintiff's business by undercutting Plaintiff's margins through the Defendants' unfair competition via its acquisition and exploitation of Plaintiff's Client Lists. Defendants are simply undercutting Plaintiff's margins until such time that Plaintiff is no longer able to continue operating so it can, wrongfully, acquire Plaintiff's market share, which is dwindling based on the Defendants' unlawful conduct.

The need to maintain the confidentiality of the information regarding Plaintiff's Clients is of paramount importance and justifies temporary relief. Defendants should be immediately enjoined from using or distributing Plaintiff's Client Lists in addition to being enjoined from contacting any of the Affiliates or Advertisers on Plaintiff's Client Lists. Courts have held that to satisfy the irreparable harm requirement, "[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v Wabtec Corp.*, 559 F.3d 110, 118, 90 U.S.P.Q.2d 1312 (2d Cir. 2009); see also *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *Moore v Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

The Affidavits of Rachel Schremp submitted in support of Plaintiff's Order to Show Cause make clear that the harm is "neither remote nor speculative" as said harm is occurring on a day-to-day basis in the form of lost revenues due to the Defendants' conversion of Plaintiff's Affiliates and Advertisers. See Affidavit of Rachel Schremp in Support of Plaintiff's Order to Show Cause ¶ 40. Furthermore, the harm is not one that can be remedied at the end of the trial of this action as, by that point, Defendant Centerpoint may no longer be operating if Defendants are allowed to continue to solicit Plaintiff's Top Affiliates and Advertisers and destroy Plaintiff's goodwill with its Clients by targeting those on Plaintiff's Client Lists throughout the pendency of this Action. Courts have held that a party's inability to continue operating and Plaintiff's loss of its customers and goodwill is sufficient to constitute irreparable harm. See *Tom Doherty Assoc., Inc. v Saban Entertainment, Inc.,* 60 F.3d 27, 37, 64 USLW 2051 (2d Cir. 1995); *R Squared Global, Inc. v Serendipity 3, Inc.*, 11 CIV. 7155 PKC, 2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011); *Freeplay Music, Inc. v Verance Corp.*, 80 Fed Appx 137, 138 (2d Cir. 2003).

## II.  PLAINTIFF HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

Plaintiff respectfully submits that in its Order to Show Cause and the Affidavits and Memorandum of Law in support thereof, it has made factual allegations and presented evidence sufficient to conclude that Plaintiff is likely to succeed on the merits.

### A. DEFENDANT ROBERTS NEVER HAD A NON-EXCLUSIVE CONTRACT WITH PLAINTIFF

Defendants incorrectly claim that Defendant Roberts had a non-exlcusive agreement with the Plaintiff. See Roberts Aff ¶ 12. Defendant Roberts also claims that Plaintiff was aware the he was working with Plaintiff's competitors while working for the Plaintiff. See Schremp Aff ¶ 12. This is untrue and against logic. Id.

Contrary to his claims, at no point during his employ with Plaintiff did Defendant Roberts ever indicate that he was working with other companies in the internet marketing industry or that he was working for any other affiliate network. Defendant Roberts always held himself out as, and led Plaintiff to believe that he worked solely for the benefit of the Plaintiff. See Schremp Aff ¶¶ 9 – 12. Not only did Defendant Roberts hold himself out to the Plaintiff as working exclusively for them, but, in fact, Defendant Roberts held himself out to the entire internet marketing industry as Plaintiff's Director of Business Development. See Schremp Aff ¶ 10. This is clear from the signature on his email account. See Exhibit C attached to Plaintiff's Order to Show Cause. Additionally, Defendant Roberts operated under the AOL instant messenger screen name as "LogicalMediaPaul". Id. Defendant Roberts claims that he was simply a contractor with a non-exclusive contract are disingenuous. It would make no sense for Plaintiff to agree to allow its Director of Business Development to also work for, and develop business and relationship on behalf of Plaintiff's competitors in the very same industry. See Schremp Aff ¶12.

While the Plaintiff and Defendant Roberts spent a considerable amount of time and had numerous meetings negotiating an independent sales representative agreement, Defendant Roberts never mentioned concurrently working for Plaintiff and Plaintiff's competition or other affiliate markets as the reason for his reluctance to enter into the proposed independent sales representative agreement. See Schremp Aff ¶ 13. Instead, Defendant Roberts expressed his concern regarding his ability to work with others in the industry *after* he no longer worked for the Plaintiff. See Exhibit A and Schremp Aff ¶ 13. As may be seen in the email from Defendant Roberts to the Chief Executive Officer of Plaintiff on July 5, 2012, Defendant Roberts suggests

that the parties "list the companies/clients/advertisers that I have brought on at Logical Media and agree that I cannot work with them for 12 months." See Exhibit A and Schremp Aff ¶ 14.

This is further evidenced by Defendant Robert's reaction when Plaintiff was advised that Defendant Roberts had been working for the benefit of another company. See Exhibit C attached to Plaintiff's Order to Show Cause and Schremp Aff ¶¶ 20-27. As may be seen, when Plaintiff asked Defendant Roberts why we had been receiving notice that he had been offering campaigns to other networks, Defendant Roberts responded "I have told other networks we are looking for traffic on our offers." Id. If Defendant Roberts truly believed Plaintiff was aware that he was also working for Plaintiff's competitors, he would have simply stated this. Instead, Defendant Roberts essentially denied the allegation and claimed that he was soliciting other networks on behalf of Plaintiff. See Aff of Schremp ¶ 17 and Exhibit E annexed to Plaintiff's Order to Show Cause.

These statements are clear evidence that Plaintiff was not one of many companies Defendant Roberts was working for, but instead, Defendant Roberts was working solely for the benefit of the Plaintiff as Plaintiff's Director of Business Development.

## B. THIS COURT HAS THE AUTHORITY TO ENTERTAIN THIS ACTION AGAINST DEFENDANT RAPP IN THE INTERESTS OF JUSTICE.

The Defendants argue that this action may not be maintained against Defendant Rapp due to the forum selection clause contained in the Employment Agreement executed by Defendant Rapp. However, the United States Supreme Court has held that such clauses "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances" *M/S Bremen v Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S. Ct. 1907, 1913, 32 L Ed 2d 513 (1972); see also *Cent. Contr. Co. v Maryland Cas. Co.*, 367 F.2d 341, 344 (3d Cir. 1966). The United States Supreme Court went on to hold in *Stewart Org., Inc. v Ricoh Corp.*, that "[a] forum-selection clause should receive neither dispositive consideration nor no consideration, but

rather the consideration for which Congress provided in § 1404(a)." *Stewart Org., Inc. v Ricoh Corp.*, 487 U.S. 22, 23, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988).

Plaintiff respectfully submits that enforcing the forum selection clause contained in Defendant Rapp's Employment Agreement would be nothing less than unreasonable. If the Court were to enforce the forum selection clause, the Plaintiff would be required to maintain two separate actions on opposite sides of the country. Plaintiff is unable to maintain an action against Defendant Centerpoint and Defendant Roberts in California as Defendant Roberts is a resident of New York and Defendant Centerpoint is a New York Limited Liability Company and, as such, a court in California would not have jurisdiction over either Defendant Roberts or Defendant Centerpoint. Hence, Plaintiff would need to maintain an action against Defendant Roberts and Defendant Centerpoint in New York, and maintain a separate action based on the same nucleus of facts in California. This, in itself, is unreasonable as nothing in this action occurred, or is even remotely connected to California, save for the forum selection clause contained in Defendant Rapp's Employment Agreement. None of the individual parties reside in California nor do either of the corporate parties maintain a place of business in California. None of the facts and circumstances in this matter occurred in California. Additionally, upon information and belief, Defendant Rapp currently resides in Indiana, and, as such, California is likely not a "convenient" forum for her either.

Maintaining separate actions in New York and California is unreasonable as the Defendants, in addition to the Plaintiff, would be required to travel cross-country to litigate both matters. Defendant Roberts and Defendant Rapp are, undeniably, material witnesses to this action. As such, if Plaintiff were required to institute a second, separate action against Defendant Rapp, Defendant Roberts would need to fly to California for depositions and to appear at trial.

As, upon information and belief Defendant Rapp resides in Indiana, she would need to fly to California for conferences, depositions and trial. However, not only would she be flying from Indiana to California to appear in Plaintiff's action against her, Defendant Rapp would also be required to fly to New York to appear as a witness for depositions and trial in the instant Action.

The foregoing inefficiency and waste of judicial resources in conducting multiple depositions and multiple trials, occurring at approximately the same time and based on the same set of facts and circumstances, in addition to the thousands of miles the parties would need to travel to appear in both actions are all sufficient reasons for this Court to deem enforcement of the forum selection clause unreasonable under the circumstances.

This Court has previously held that courts may "refuse to enforce a choice-of-law clause only where…the parties' choice has no reasonable basis…" *Beatie and Osborn LLP v Patriot Scientific Corp.,* 431 F Supp 2d 367, 378 (S.D.N.Y. 2006). Plaintiff respectfully submits that the forum selection clause in Defendant Rapp's Employment Agreement has no reasonable basis or relation to the matter at bar. Courts are given a "broad range of discretion" in determining motions for transfer, and such decisions are based upon "notions of convenience and fairness on a case-by-case basis" *Beatie and Osborn LLP v Patriot Scientific Corp.,* 431 F. Supp. 2d 367, 394 (S.D.N.Y. 2006); see also *In re Cuyahoga Equip. Corp.*, 980 F. 2d 110, 117 (2d Cir. 1992). The Court further held as follows:

> The Court assesses the balance of convenience and the interest of justice by weighing: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of the circumstances.

11

<u>Beatie and Osborn LLP v Patriot Scientific Corp.</u>, 431 F. Supp. 2d 367, 395 (S.D.N.Y. 2006).

Not only does the aforementioned test favor conducting a single action in New York, but none of the factors weigh in favor of conducting a separate action against Defendant Rapp in California.

In this action, the convenience of witnesses and the convenience of the parties clearly leans in favor of New York as, upon information and belief, Defendant Roberts resides in New York and Defendant Centerpoint is a New York Limited Liability Company. Additionally, upon information and belief, Defendant Rapp resides in Indiana, and, as such, there is nothing about conducting a separate trial against Defendant Rapp in California which is convenient to any potential witnesses or to the parties themselves.

Additionally, the location of relevant documents, in particular Plaintiff's Client Lists which are, upon information and belief in the possession of Defendant Centerpoint and/or Defendant Roberts, is in New York. Additionally, any other sources of proof are likely to be in New York as Defendant Centerpoint is headquartered here. These factors, too, weigh in favor of conducting a single action in New York. There is no indication whatsoever that any of the relevant documents or sources of proof would be located in California as none of the parties reside in California and none of the operative facts and circumstances occurred in California.

With regard to the seventh factor regarding the forum's familiarity with the governing law, this Court is not only familiar with cases such as these and the law governing same, but is often looked toward for setting the standard in many of these cases.

The final factor is trial efficiency and the interests of justice based on the totality of the circumstances. As detailed above, this final factor undeniably lies heavily in favor of conducting a single trial in New York as opposed to conducting two separate trials on opposite sides of the

country, particularly when there is no relevant connection between the facts, circumstances, evidence, and parties in this matter and the State of California.

The interests of justice lie in favor of conducting a single action here in New York. As noted in the Defendants' Response to Plaintiff's Order to Show Cause, California law renders non-compete agreements/clauses as unenforceable, with limited exception. However, as is evidenced by the Employment Agreement and the End of Affiliation Agreement, this was clearly not the intent of the parties. The Employment Agreement contains non-solicitation, non-compete, confidentiality and non-disclosure clauses. *See* Exhibit F attached to Plaintiff's Order to Show Cause. It is axiomatic that the parties, in executing the Employment Agreement, intended the provisions of said agreement to be enforceable. To argue that the parties included the aforementioned provisions while knowing and intending that these provisions not be enforceable would be disingenuous, at best.

It is well-settled law that "[t]he primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Cie. Financiere de CIC et de L'Union Europeenne v Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F3d 153, 157 (2d Cir. 2000); see also *D & N Prop. Mgt. & Dev. Corp., Inc. v Copeland Companies*, 127 F. Supp. 2d 456, 461 (S.D.N.Y. 2001). Since the parties included the non-compete clause in their Contract, their intent to be bound by said clause is obvious. See Exhibit F attached to Plaintiff's Order to Show Cause. Moreover, Defendant Rapp acknowledged and agreed, in executing the End of Affiliation Agreement, that she was bound by confidentiality and the non-compete agreement, further manifesting and evidencing her intent to be bound by the clauses contained in the agreement, regardless of the applicability of California Law. See Exhibit G attached to Plaintiff's Order to Show Cause.

Based on the foregoing, Plaintiff respectfully requests that this Court exercise the discretion afforded to it and maintain the instant action in this Court so as not to bifurcate the litigation, resulting in two separate trials to be conducted on opposite sides of the country, regarding the same operative facts and circumstances, involving the same parties, same witnesses and the same evidence.

### C. THE PURPORTED HARM TO THE DEFENDANTS IS FAR LESS THAN THE IRREPARABLE HARM PLAINTIFF WILL SUFFER SHOULD THE INJUNCTION BE DENIED.

The harm to Plaintiff absent this Court granting the requested injunction as requested herein vastly outweighs any harm to Defendants from its issuance. The Defendants claim that if the injunction is granted Defendant Centerpoint "will have to break off relationships with some of its affiliates and advertisers" which, it should be noted, Defendant Centerpoint obtained through unlawful means by converting the Plaintiff's Client Lists to its own use. See Roberts Aff ¶ 21.

During his employment with the Plaintiff, Defendant Roberts organized and opened Defendant Centerpoint, an internet based affiliate network company in direct competition with Plaintiff. See Aff of Schremp at ¶ 20 and Exhibit A. Plaintiff's Affiliates and Advertisers number in the thousands; however, Defendants have directly targeted and continue to solicit away from Plaintiff its Top Affiliates, i.e. the Plaintiff's ten top paying Affiliates from which Plaintiff derives 30% of its revenues. See Affidavit of Rachel Schremp in Support of Plaintiff's Order to Show Cause dated June 12, 2013 at ¶¶ 9-10. Defendants should be enjoined from unfairly competing with Plaintiff by using Plaintiff's confidential and proprietary trade-secret information, which Defendant Roberts and Defendant Rapp acquired during their employ with the Plaintiff.

If Defendant Centerpoint did not rely on any of Plaintiff's confidential information in building and developing their client lists, as claimed in the Affidavit of Defendant Roberts, Defendant Centerpoint's customer list must vary greatly from that of the Plaintiff and, as such, the injunction would have little effect on Defendant Centerpoint's business since the amount of overlap between the client lists must be negligible. <u>See</u> Roberts Aff ¶ 22.

Furthermore, if obtaining clients and gathering their pertinent information is as easy and readily available as Defendant Roberts claims, the injunction from contacting and/or soliciting Plaintiff's Affiliates or Advertisers should have a minimal effect on Defendant Centerpoint as Defendant Roberts can simply continue prospecting and monitoring blogs for more affiliates and advertisers to recruit as clients. <u>See</u> Roberts Aff ¶¶ 16 – 19.

On the other hand, should the injunction not be granted, Plaintiff will likely be forced to cease operations and close its doors due to the Defendants' unlawful taking of Plaintiff's Client Lists and the solicitation of Plaintiff's Affiliates and Advertisers. <u>See</u> Affidavit of Rachel Schremp in Support of Plaintiff's Order to Show Cause dated June 12, 2013 ¶ 40.

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Honorable Court enter an Order granting Plaintiff's Order to Show Cause in its entirety.

Dated: June 27, 2013

**LAW OFFICES OF KISHNER & MILLER**

By:    <u>s/ Ryan O. Miller</u>
       Ryan O. Miller (RM-4616)
       420 Lexington Avenue, Suite 300
       New York, New York 10170
       rmiller@kishnerlegal.com
       Tel: (212) 585-3425
       Fax: (212) 751-1810

       Attorneys for Plaintiff

15
